UNITED STATES v. E. W. BLISS CO.

(Circuit Court of Appeals, Second Circuit. June 8, 1915.)

No. 132.

UNITED STATES ⊜70—CONSTRUCTION OF CONTRACTS—CONTRACT TO MANU-FACTURE TORPEDOES FOR NAVY—RESTRICTIVE PROVISIONS.

A provision in a contract for the manufacture by defendant of torpedoes for the United States Navy that defendant should not "make use of any device the design for which is furnished to it by [the United States] in any torpedo constructed or to be constructed, for any person or persons, firms, corporations, or others, or for other governments," *held* to apply to all devices furnished by the United States, without regard to whether they were patentable, or were within the prior art, or known to defendant, and also to a device so furnished, although it was patented in this and other countries; the American patent being assigned to the United States, and the foreign patents to defendant, the question being one of contract, and not of patent rights.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 53; Dec. Dig. ⊜70.]

Appeals from the District Court of the United States for the Eastern District of New York.

On cross-appeals from a decree of the District Court for the Eastern District of New York. The defendant seeks to reverse that portion of the decree which restrains it from making use of the "balanced turbine" in any torpedo constructed for any corporation, individual or government other than the complainant and from exhibiting or communicating to any such corporation, individual or government any torpedo which shall contain the said balanced turbine. The complainant seeks to reverse that part of the decree which dismisses the bill and refuses an injunction as to other parts of the torpedo which the complainant contends were designed by its officers, agents and servants, such, for instance, as ball bearings for the gyroscope. The complainant also seeks to reverse the decree for the reason that the court should have decided that the disclosure of any of the alleged novel constructions was a violation of the law of the United States known as the National Defense Act of March 3, 1911.

The following is the opinion of Van Vechten Veeder, District Judge, in the court below:

In this suit the complainant seeks to enjoin the defendant from communicating the complete construction and operation of the existing type of Bliss-Leavitt torpedo, so called, and from making any demonstration thereof, to a representative of Messrs. Whitehead & Co., or to any other person or government. The complainant bases its claim to relief partly upon contract provisions, and, in the alternative, upon the provisions of Act Cong. March 3, 1911, c. 226, 36 Stat. 1084, 1085 (Comp. St. 1913, §§ 10210–10212), commonly called the National Defense Act.

It appears that the defendant has been making torpedoes for the use of the United States Navy since November 22, 1905. Pursuant to the terms of various contracts between the parties, several lots of torpedoes have been delivered to the complainant, but there remain undelivered some of the torpedoes called for by a contract of June 12, 1912, as well as all those specified in contracts subsequent thereto. The only contracts in evidence are

those of November 22, 1905, and June 12, 1912, mentioned in the complaint, and one of the intervening contracts, dated June 16, 1909. In the 1905 contract there was the following provision, which it is admitted was embodied in all the subsequent contracts:

"Nineteenth. It is hereby expressly further stipulated, covenanted, and agreed that the party of the first part will not make use of any device the design for which is furnished to it by the party of the second part in any torpedo constructed or to be constructed for any person or persons, firms, corporations, or others, or for other governments than the party of the second part hereto; that the party of the first part will not exhibit such device, or in any way describe it to, or give any information in regard to it to, any person or persons, firms, corporations, or others, or to other governments, or their representatives, than the party of the second part hereto; that the party of the first part will not exhibit the performance of any torpedo containing such device, either in shop or in service tests, to any person or persons, firms, corporations, or others, or to other governments, or their representatives, than the party of the second part hereto; that, in case of breach of these provisions on the part of the party of the first part, the party of the second part shall be at liberty to cancel this contract and to proceed with the manufacture, by contract or otherwise, of the torpedoes herein contracted for, including all improvements, without payment of royalty, license fee, or other charge, on account of the use therein or in the manufacture thereof of any models, designs, devices, appliances, methods, or ideas, or other features invented and communicated to the party of the first part by the party of the second part or its representatives; that in case of such breach all torpedoes, with the designs, drawings, patterns, models, and prepared material therefor, on account of which payment in any amount shall have been made under this contract, shall become the property of the party of the second part, and shall on demand therefor be delivered to it by the party of the first part, and any and all sums of money or payments due the party of the first part by the party of the second part under this contract shall be forfeited to the party of the second part, and the party of the second part shall thereby and thereupon be released and discharged from all and every claim or demand of any and all kinds whatsoever on account of this contract: Provided, furthermore, that no device or design shall be considered as coming within the provisions of this clause unless the party of the second part shall state to the party of the first part in writing, at the time when the said device or design is itself conveyed to the party of the first part by written communication from the party of the second part, that the party of the second part considers that the said device or design is embraced within the provisions of this clause."

In the contract of June 12, 1912, the foregoing clause became clause 20. The 1912 contract contained, however, in the second clause, the following new matter, which (save that part inclosed by brackets) had not been included in previous contracts:

"[Second. The manufacture of said torpedoes]—the word 'torpedoes' as used throughout this contract being intended to include everything covered by the drawings, plans, and specifications above referred to—[shall conform in all respects to and with said drawings, plans, and specifications,] including duly authorized changes therein, but said drawings, plans, and specifications are not hereto annexed or made a part hereof. They contain information of a confidential character that cannot be made public without detriment to the government's and the contractor's interests, and they are to be treated as confidential by the parties of this contract, it being understood, however, that nothing in this clause shall be construed as depriving the party of the first part of the right to make and sell such torpedoes to any other party or government whatsoever, except as limited by clause twentieth of this contract."

Eventually the defendant, desiring to negotiate with Messrs. Whitehead & Co. for the sake of the right to manufacture the Bliss-Leavitt torpedo in certain foreign countries, and being met by the opposition of the Bureau of Ordnance, communicated to the Secretary of the Navy on May 9, 1913, its desire to submit the issue to judicial decision, adding: "As a means to this end we notify you hereby that it is our intention to communicate the complete construction and operation of the existing type of Bliss-Leavitt torpedo, and to

make a demonstration of the operation of said torpedo, to a representative of Messrs. Whitehead & Co. on or immediately after June 1, 1913."

Thereupon this suit was brought. Although the issue arose over the use of the so-called balanced turbine, the bill of complaint sets forth four devices the design for which is claimed to have been furnished by the complainant to the defendant in accordance with the restrictive terms (as quoted above) of the contracts: (1) The balanced turbine; (2) ball bearings in the gyroscope; (3) superheater; and (4) compound air regulator. In addition to the foregoing devices, the complainant specifies four other principles, designs, and devices, which, although not furnished by the complainant to the defendant in accordance with the terms of the nineteenth and twentieth clauses of the contracts, are nevertheless claimed to have been communicated or suggested to the defendant by the complainant, and the disclosure of which, together with those already mentioned, is prohibited, it is contended, by the National Defense Act of March 3, 1911 (36 Stat. 1084, 1085, c. 226): (a) Changes in location and area of vertical rudders; (b) changes in method of starting torpedoes; (c) changes in type of depth engine; and (d) changes in curved fire gyro. All the foregoing devices and designs are alleged to be contained in the existing type of Bliss-Leavitt torpedo.

I construe the agreement between the parties to mean that the Bliss Company was free from the beginning to make and sell torpedoes to any other party or government, save as limited by the restrictive clause relating to devices the design for which had been furnished by the government; that is to say, the additional clause in the 1912 contract made explicit that which was implicit in the contract of 1905 and intervening contracts. The Bliss Company agrees that "it will not make use of any device the design for which is furnished to it by the party of the second part in any torpedo constructed or to be constructed for any person or persons, firms, corporations, or others, or for other governments." The defendant contends that the word "furnished" must be construed to mean the furnishing of devices which were unknown, not only to the defendant, but in the prior art as well; in other words, such devices only as were patentable at the time the design was furnished. I am unable to assent to such a construction. It is warranted neither by the plain wording of the contract nor by the surrounding circumstances. The evidence shows that the Navy Department was carrying on extensive independent experiments with torpedoes, utilizing the skill and experience of its own officers. The defendant was occupied in developing its torpedo in conformity with the wishes of its sole customer. Inasmuch, however, as the defendant was not prohibited from making torpedoes for others, some provision was necessary to protect the government in its contributions to the joint result. The contract provision indicates, as the evidence shows, that this method was deliberately adopted by the government as the most secure and efficient method of protecting its interest. There would be no security for that interest if the defendant, incorporating devices furnished by the government, could afterwards sell those devices to other persons or governments, unless the Navy Department could establish patentable invention in each instance.

It seems plain to me that, in the consideration of any contribution made by the government, the prior art, as well as the defendant's actual knowledge, with respect thereto, is as irrelevant as the question whether any such device was or is more or less efficient than another device which was available and might have been used. "Furnish," as used in the context, means simply supplying a device not then in use in the torpedo. It is urged that this conclusion will bear heavily upon the defendant, since it may conceivably result in depriving it of the commercial use of devices available to others as part of the prior art; but if the consequences of its formal agreement were at all relevant to the issue, it would be reasonable to suppose that they were carefully considered in the formation of its very valuable business relations with the government, and, in any event, it would be obviously inequitable to permit it to use, for a period of years, in making torpedoes for the government, a device furnished by the government, and then, when it seeks to sell the developed torpedo to other persons or governments, to raise for the first time an issue of prior knowledge or prior art.

It appears from the evidence that three of the devices relied upon by the

government were furnished under the 1905 contract and the fourth under the 1912 contract, and the claim is made by the defendant that, since the 1912 contract superseded the previous contracts, an injunction can issue only against violations of that contract. A subsequent contract covering the same subject-matter as a prior contract doubtless supersedes the earlier contract. Here, however, each successive contract, while relating to torpedoes, covered different subject-matters. In this case it appears that the restrictive provision concerning devices furnished by the government was incorporated in substantially the same terms in each successive contract, and I have no doubt that, when once the design is furnished and notice given under any contract, the restrictive covenant applies under subsequent contracts so long as the device continues to be used in torpedoes made under those contracts.

The Bliss Company has notified the government that it proposes to communicate the complete construction and operation of the existing type of Bliss-Leavitt torpedo to a prospective purchaser. The expression "existing type" would ordinarily mean every type in existence or use; but inasmuch as the Bliss Company expressly refers, at the outset of its notice, to the 1912 contract, and the evidence is not clear whether any other type is at present in existence or use, the type of torpedo called for by that contract may be accepted as the type involved in this suit. Accordingly, in the absence of any contention by the defendant that the penalty prescribed in the contract is exclusive, I have only to find which, if any, of the four devices relied upon by the government were furnished by it in accordance with the terms of the contract, and which, if any, of the devices thus furnished are embodied in the existing type of torpedo.

I find that designs for the following devices were furnished to the defendant by the government, and that, at the time such devices or designs were conveyed to the defendant by written communication from the government, the government stated to the defendant in writing in each instance that the device or design was embraced within the provisions of the restrictive clause of the contract: (1) The balanced turbine, as specified in Exhibits 28 and 29, dated January 10, 1907; (2) ball bearings in the gyroscope, as specified in Exhibits 52 and 53, dated March 31, 1906; (3) improvement in inside superheater, as specified in Exhibits 54 to 57, inclusive, dated September 18, 1906. Of the foregoing three devices, I find that the balanced turbine is embodied in the existing type of torpedo. In reaching this conclusion, my criterion has been: Do the essential features and function of the device appear? If they do, then mechanical alterations, though they add to its efficiency, or even improvements which disclose invention, are immaterial.

A defense special to the balanced turbine has been strenuously urged by the defendant. It appears that the balanced turbine was invented and patented by Lieutenant Commander G. C. Davison, U. S. N. He applied for a patent under date of October 19, 1906, the patent was allowed on December 6, 1906, and was issued under date of June 25, 1907. Meanwhile, on December 27, 1906, Davison had assigned to the United States Navy Department the full and exclusive right to his invention; and on or about January 10, 1907, the design, Exhibit 28, had been conveyed to the Bliss Company by the government. In October, 1907, Davison applied for a patent in Great Britain, and in the following year patents were issued to him in that country and several others. These foreign patents were assigned by Davison to the defendant. Davison testified that he told the commandant of the torpedo station and the chief of the Bureau of Ordnance of these assignments to the defendant. On these facts the defendant contends that the government waived the restrictive covenant. That covenant, it asserts, was nothing more than a secrecy clause, and the balanced turbine having been published to the world by the issue of the patents, it would be inequitable to forbid the defendant, the assignee of the foreign patents, the use of a device available to others.

The obvious answer to this argument has already been pointed out. While some of the provisions of the restrictive clause directly prohibit disclosure, it is also expressly agreed that "the party of the first part will not make use of any device the design for which is furnished to it by the party of the second part in any torpedo constructed or to be constructed for any person * * * or for other governments." And even with respect to secrecy it is apparent

that there is no disclosure in the patent of what part, if any, of that invention is embodied in Exhibit 28 or in the existing type of torpedo. It seems necessary to point out that this suit is based upon contract, not upon patent infringement. For the defendant has indulged in some reflections upon the futility of an injunction against it as the assignee of foreign patents for the balanced turbine. But the government does not sue as the assignee of a patent limited to the territorial boundaries of the United States. It sues for an injunction to prevent the breach of a contract provision subject to no such territorial limitation.

The government further contends that by virtue of the National Defense Act of 1911 the defendant should be restricted from disclosing, and therefore from making and selling, torpedoes containing, not only all the devices already considered, but several others (specified above), which, although suggested to the defendant by the complainant with more or less particularity, were actually worked out by the defendant, and were not accompanied by any actual design, or by the notice required by the restrictive covenant. I am of opinion that such a contention is not sound. The National Defense Act is a criminal statute, and a court of equity ordinarily has no jurisdiction to enjoin the commission of a crime. When, however, some interference, actual or threatened, with property or proprietary rights appears, the jurisdiction of a court of equity is not ousted by the fact that such interference is accompanied by, or is itself, a violation of the criminal law. If, in this instance, the exhibition and demonstration of the existing type of Bliss-Leavitt torpedo to any other person or government be a violation of the penal statute, doubtless the defendant would be subject to prosecution for the offense; if such exhibition and demonstration violates the property rights of the government, no doubt the court may grant such equitable relief as the case requires; but the fact that it was a violation of the criminal law would not be material to the consideration of equitable relief. Now, the complaint does not set up the violation of the penal statute as a separate cause of action, but avers that the defendant intends "thereby to violate the laws of the United States," and prays that the defendant be enjoined from violating such laws. But the court can grant relief in this case only to prevent a violation of the complainant's contract rights. And, apart from the rights acquired by the government pursuant to the terms of the agreement, the Bliss-Leavitt torpedo is the defendant's property.

Inasmuch as the existing type of torpedo contains a device the design for which was furnished by the government pursuant to contract, the complainant is entitled to a permanent injunction.

Archibald R. Watson, of New York City, John H. Harrington, and Melville J. France, of Brooklyn, N. Y., for the United States.

Arthur C. Fraser, Albert B. Boardman, Frank H. Platt, and Robert H. Elwell, all of New York City, for defendant.

Before COXE, WARD, and ROGERS, Circuit Judges.

COXE, Circuit Judge. Clause 19 of the contract of November 22, 1905, which became clause 20 in the contract of June 12, 1912, is the clause out of which the controversy between the parties principally arises. The contract provides that the Bliss Company will make and deliver at Newport, R. I., 300 torpedoes of the Bliss-Leavitt 5-meter 12-inch mark 1 type. The manufacture of these torpedoes is to conform to plans and specifications annexed to the contract and the work is to be done and the materials are to be furnished under the supervision of inspectors appointed by the Secretary of the Navy. When completed, the torpedoes are to be tested and need not be accepted by the government unless they comply with all the requirements of the specification. Clause 19 also provides that the Bliss Company will not

make use of any device the design for which is furnished by the United States, represented by the Bureau of Ordnance, in any torpedo constructed for persons or governments, other than the United States. This clause further provides that the Bliss Company will not exhibit, describe or give information in regard to such' devices to any firms, corporations or governments other than the United States. The Bliss Company agrees that it will not exhibit any torpedo containing such device to any governments, or to their representatives, other than the United States. In case of the breach of these provisions by the Bliss Company the United States shall be at liberty to cancel the contract and proceed with the manufacture of torpedoes contracted for in the agreement, including all improvements, without the payment of royalty, license fee or other charge on account of the use therein of any models, designs, devices, appliances or other features invented and communicated to the Bliss Company by the United States or its agents. The clause further provides that in the case of a breach by the Bliss Company, all torpedoes with the designs, drawings, patterns, models and prepared material therefor, on account ·of which payment in any amount shall have been made, shall become the property of the United States. Clause 19 concludes as follows:

"Provided. furthermore, that no device or design shall be considered as coming within the provisions of this clause unless the party of the second part shall state to the party of the first part in writing, at the time when said device or design is itself conveyed to the party of the first part by written communication from the party of the second part, that the party of the second part considers that the said device or design is embraced within the provisions of this clause."

In 1912 another contract was made between the parties for the manufacture of one hundred and twenty additional torpedoes of the same type, in which it is stated that the torpedoes are to conform in all respects to the drawings referred to which are not annexed to the contract for the reason that:

"They contain information of a confidential character that cannot be made public without detriment to the government's and the contractor's interests, and they are to be treated as confidential by the parties to this contract, it being understood, however, that nothing in this clause shall be construed as depriving the party of the first part of the right to make and sell such torpedoes to any other party or government whatsoever, except as limited by clause twentieth of this contract."

The bill alleges that the feature of the balanced turbine was invented by the officers composing the Bureau of Ordnance in 1906–07 and due notice thereof under clause 19 was given to the defendant; that in like manner the complainant gave notice, through its agents, of changes in the vertical rudder, the method of starting the torpedo, in the engines, the fire gyro, the independent spin, the ball bearings of. gyro and compound regulation of the air.

This case illustrates the importance of a great government like the United States having a manufactory of its own for the manufacture of torpedoes and other implements of war which are improved and changed from time to time by the addition of ingenious mechanism which should clearly be kept secret, unless our enemies are to profit

equally with ourselves in every improvement which the ingenuity of our army and navy officers may suggest. The futility of attempting by agreement to give to an outside contractor the benefit of such improvements as he may suggest while keeping secret other improvements in the same machine devised by officers of the navy and their assistants, is demonstrated by the testimony in the case at bar. How is it possible for the Bliss Company to make public their own improvements and suggestions, in the construction of a given type of torpedo, and at the same time keep secret the suggestions and improvements made by the officers of the navy and their assistants? The defendant insists that all of the improvements in controversy were suggested and embodied in working models by it or its employés. Mr. Leavitt, defendant's chief engineer, testifies that the defendant got no assistance whatever from the government officials and that though they made many suggestions, not a single one was adopted by the Bliss Company. On the other hand, the government insists that all of the improvements now in controversy were the result of the experiments made by the Bureau of Ordnance of the United States Navy.

Stated concretely the question now to be considered is whether or not the Bliss Company has a right to exhibit and sell to the representatives of foreign nations the so-called Bliss-Leavitt torpedo. We think it is clear that it cannot do so. The language of the nineteenth clause is explicit and its purpose is obvious, viz., to keep secret the construction of any torpedo which contains a device the design for which is furnished by the United States or its agents and to bind the defendant not to disclose the performance of any torpedo containing such device to any one other than the United States. The contract should be construed in view of what must have been the intention of the United States. She was not engaged in procuring a perfected torpedo for the benefit of foreign nations. Her officers and experts were endeavoring to secure some device which was better than those possessed by foreign nations. That she should wish her experiments kept secret is too obvious for argument. Indeed, it might almost be inferred without specific provisions. The contention of the defendant is very clearly stated in the letter of May 9, 1913, in which it says:

"We have repeatedly insisted that said article of the contract (20) did not apply for the protection of any principle, but merely to 'any device the design for which was furnished for us by the government'; that the specific design furnished has been and will be kept a secret; that the 'principle' having been made public by the grant by the government of a patent for it, which patent the government afterwards purchased, the 'principle' of the balanced turbine is no longer a confidential matter and we cannot be held to a secrecy which the government has itself waived."

We think this takes too narrow and superficial a view of the matter and if followed will leave the government practically remediless unless she makes her munitions of war in her own factories. It is true that the contents of the Davison patent were made public when the patent was issued, but the government purchased it and no one can use its disclosures without infringing unless he has obtained a license so to do. "A principle" is not the subject of a patent except through the instrumentalities by which the principle is carried out. No one can

secure a patent for the principle of striking the enemy's ship under water with a loaded torpedo. As the means disclosed by Davison's patent belong to the complainant, it is not easy to see what rights the defendant acquired by the granting of the Davison patent. If it owned the patent or if it were licensed under it, a different question would arise, but being, in a sense, the confidential agent of the government in the making of torpedoes, it acquired no rights adverse to those of the government. We fail to see how the defendant has acquired a right to do what it promised it would not do because a patent has been issued which makes public some of the methods and devices used in the manufacture of the Bliss-Leavitt torpedo. In this connection it is interesting to note that the defendant agreed with this view in December, 1912, when it wrote to the Bureau that the publication of the patents in no way prevented the real construction of the fundamental parts of the torpedo from being kept secret.

There can be no doubt, we think, that the balanced turbine was the invention of Lieutenant Commander Davison, acting for the United States, and that the government did not lose the benefits of the invention because the patent subsequently issued in his name, and assigned to the government, "disclosed" the invention to the world. Certainly the fact that foreign patents were issued which were subsequently purchased by the defendant did not give the defendant the right to make, use or sell the patented structure in this country without the license of the owner of the patent.

The contract of June 12, 1912, provides that the drawings, plans and specifications used by the defendant in making the government torpedoes should not be disclosed to any one. Although the Bliss Company might sell torpedoes to other nations and individuals it could not sell such torpedoes if they contained a device designed by the government, acting through its officers and experts.

Throughout the entire record, in the contracts, correspondence and dealings of the parties, the importance of secrecy is everywhere manifest. The nature of the services rendered was such that secrecy might almost be implied. It is difficult to imagine a nation giving to one of its citizens contracts to manufacture implements necessary to the national defense and permitting that citizen to disclose the construction of such implement or sell it to another nation. The very nature of the service makes the construction urged by the defendant untenable. We are of the opinion, therefore, that the injunction should include all designs, drawings, plans and specifications used by the defendant in making the Bliss-Leavitt torpedo for the government which were approved by the Ordnance Bureau, notice of which was given to the Bliss Company pursuant to the provisions of clauses 19 and 20 of the contracts in question.

The decree should be amended by adding such a provision and, as so amended, it should be affirmed with costs.